**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-CR-237-2 (CJN)** |
| **ALAN ST. ONGE,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Alan St. Onge to 21 months' imprisonment, three years' supervised release, $2,000 in restitution, and a $200 special assessment.

## I.      INTRODUCTION

The defendant, Alan St. Onge, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

St. Onge, a 6'4" 310-pound 36-year-old man from North Carolina, lent his considerable size and strength to the group efforts against the police that took place on the East Front of the U.S. Capitol and inside the Lower West Terrace tunnel. St. Onge pushed against other rioters who were pushing against the police and the police barricades on the East Front of the U.S. Capitol. St. Onge then moved around the building to the West Plaza where he made his way to the front of the crowd as rioters tore down barricades and fought police. After the police line on the West Plaza was breached, St. Onge followed the police up to the Inaugural Stage and into the Lower West Terrace tunnel. St. Onge entered and exited the tunnel at least three separate times over the span of approximately 25 minutes, joining group push efforts against the police, handing up items to other rioters to use against the police, and assisting other rioters who had been sprayed with OC spray.

St. Onge committed the instant offenses while under a criminal justice sentence. And after he was charged in this case and while he has been under the supervision of this Court, St. Onge violated his pretrial release when he was arrested again following a bar fight during which he struck another patron.

The government recommends that the Court sentence St. Onge to 21 months of incarceration, at the top of the 15 to 21-month guideline range. A 21-month sentence reflects the seriousness of St. Onge's conduct on January 6 and provides just punishment and specific deterrence for future crimes by St. Onge.

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

II.    FACTUAL BACKGROUND

A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the Statement of Offense filed in this case, ECF 101, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

B.    Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the doors of the West Front of the U.S. Capitol Building

The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line. *Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the area known as the Lower West Terrace ("LWT").   The entrance usually consists of a flight of stairs leading to a doorway.   On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long.   That tunnel led to two sets of metal swinging doors inset with glass.   On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building.   The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the

West Front of the Capitol Building.   This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries on Inauguration Day.   "Inauguration at the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.



On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby.   Members of the United States Capitol Police ("USCP"), assisted by officers from the District of Columbia Metropolitan Police Department (MPD), were arrayed inside the doorway and guarding the entrance.   Many of these officers had already physically engaged with

the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 p.m., the mob broke the windows to the first set of doors, and the law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist.   The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging law enforcement with batons, poles, chemical spray, bottles and other items.   Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray.   At a later hearing on the events of January 6, Congressman Stephanie Murphy described her experience nearby this location in response to testimony from MPD Officer Daniel Hodges, who was assaulted while caught in the tunnel doors between the two forces:

> January 6th was an attack on our democracy, it was an attack on the peaceful transfer of power, and it was an attack on this Capitol building, but it was also an attack on real people.   And most people don't know this -- and I don't think even you know this -- but your actions had a profound impact on me.   So, at 3:00 p.m. on January 6th, 2021, while you were holding back the mob at the Lower West Terrace entrance, I was holed up with Congresswoman Kathleen Rice in a small office about 40 paces from the tunnel that you all were in. That's about from the distance where I'm sitting here on the dais to that back wall.   And from that office in close proximity to where you all held the line, I listened to you struggle.   I listened to you yelling out to one another.   I listened to you care for one another, directing people back to the makeshift eyewash station that was at the end of our hall.   And then, I listened to people coughing, having difficulty breathing, but I watched you and heard you all get back into the fight."   Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers.   The battle for the LWT entrance involved intense hand-to-hand combat, and some of the most violent acts against law enforcement, including the abduction and tasering of MPD Officer Michael Fanone and the previously mentioned assault of Officer Daniel Hodges.

### C.  St. Onge's Role in the January 6, 2021 Attack on the Capitol

St. Onge traveled from North Carolina to the Washington D.C. area on January 5, 2021. He spent the night in an Airbnb in Maryland and traveled Washington D.C. on the morning of January 6 to attend the Stop the Steal Rally. According to St. Onge, he was not able to find the rally but watched Former President Trump's Speech from a screen that was erected somewhere near U.S. Capitol grounds.

At approximately 1:45 p.m., St. Onge was located on the East Front of the U.S. Capitol building where the police bike rack barricades were still in place. Shortly thereafter, the people in front of him began to push and pull on the barricades directly in front of a line of police officers. St. Onge joined this fight by making his way through the crowd, using his considerable size and strength to push against the people in front of him who were pushing against police, and by reaching around people to grab and pull the police barricade. *See* Exhibit A.



*Image 1: Still Image from Exhibit A at Timestamp 1:06 Showing St. Onge Pushing Against Other Rioters*



*Image 2: Still Image from Exhibit A at Timestamp 01:14 Showing St. Onge Pulling on Barricade*

Shortly after this push against the police on the East Front, St. Onge made his way around the building to the West Front, where he advanced to the front of the dense crowd where rioters were actively fighting against the police. *See* Exhibit B.



*Image 3: Still Image from Exhibit B (MPD bodyworn camera video) Showing St. Onge Standing on the West Front as Violence Against the Police Erupted Around Him*

While on the West Plaza as the police defended against numerous violent assaults, St. Onge told a nearby rioter who was filming, "the fact that we support these motherfuckers [the police], I can't believe it." *See* Exhibit C, open-source video at timestamp 00:24. When the police line on the West Plaza was breached and the police were forced to retreat, St. Onge advanced. *See* Exhibit D, open-source video. St. Onge then made his way up to the Inaugural Stage where a large crowd had already gathered outside the Lower West Terrace tunnel. St. Onge pushed his way through the crowd and near the entrance of the tunnel at approximately 2:55 p.m. As he stood under the

archway, another rioter handed him a stolen USCP riot shield, which he held for several seconds before setting it down against the wall.



*Image 4: Still Image from CCTV Showing St. Onge with the Riot Shield*

Shortly thereafter, St. Onge was handed a large black speaker, which he handed forward into the tunnel, presumably to be used against the police. *See* Exhibit G, open-source video.



*Image 5: Still Image from Exhibit G at Timestamp 00:26 Showing St. Onge Handing Up a Black Speaker*

St. Onge also handed water bottles to rioters further forward in the tunnel and helped other rioters wash out their eyes with water to treat the effects of OC spray. *See* Exhibit F, CCTV footage at timestamp 3:01:25. St. Onge also pushed a smaller rioter with a gas mask forcefully through the crowd, apparently helping the rioter to get through the throng of people and to the police line. *See* Exhibit F at timestamp 3:01:52. St. Onge left the area near the mouth of the tunnel at approximately 3:02 p.m.

St. Onge then returned to the tunnel at 3:09 p.m. and immediately moved further into the tunnel to push into other rioters who pushed against the police. *See* Exhibit H, CCTV footage from beginning. St. Onge was pushed out of the tunnel shortly thereafter – at approximately 3:11 p.m. - by the crowd and the police. *Id.* St. Onge came back into the tunnel for a third time at approximately 3:16 p.m. and once again, joined the rioters in the tunnel to push against the police in a rocking "heave ho" motion. In fact, the impact of St. Onge's considerable size and strength on the push against the police is obvious in the CCTV footage from this time. *See* Exhibit I, CCTV footage.



*Image 6: Still Image from Exhibit I Showing St. Onge Forcefully Pushing*

St. Onge pushed in a "heave ho" motion at least ten times before the police gained momentum and pushed him and the other rioters out of the tunnel. *Id.* After being ejected from the tunnel for a third time, St. Onge remained in the area outside of the tunnel for several more minutes.

**D.     St. Onge's Interview Pursuant to the Plea Agreement**

St. Onge was interviewed by the government on May 8, 2024 pursuant to the terms of his plea agreement. During that interview, he stated that he traveled to the Washington, D.C. area from his home in North Carolina on January 5, 2021. He stayed the night in an Airbnb in Maryland and went to Washington, D.C. the following morning to attend the Stop the Steal Rally. St. Onge claimed he was not able to find the rally but found a large screen that was showing Former President Trump's speech. St. Onge watched the whole speech and then made his way toward the East Front of the U.S. Capitol.

St. Onge admitted that he pushed against police and grabbed onto the barricade on the East Front. He claimed that the barricades on the East Front had not yet been breached when he decided to walk around the building to the West Front. When he arrived at the West Front, he saw police and some rioters fighting them. From there he went up to the Inaugural Stage and toward the tunnel. St. Onge admitted that he pushed with other rioters, that he handled a police riot shield and that he helped other rioters to decontaminate their eyes from OC spray. However, St. Onge claimed that he did not know that there were police officers inside the tunnel at any point while he was in that area. St. Onge claimed that after leaving the tunnel, he went back down toward the West Front and went back to his car.

**III.     THE CHARGES AND PLEA AGREEMENT**

On January 23, 2024, a superseding information was filed charging St. Onge with two counts of violating 18 U.S.C. § 231(a)(3), with one count representing his push against the police on the East Front and another count representing his actions against the police inside the Lower

West Terrace tunnel. On January 31, 2024, St. Onge was convicted of those offenses based on a guilty plea entered pursuant to a plea agreement.

## IV.    STATUTORY PENALTIES

St. Onge now faces sentencing on two counts of violating 18 U.S.C. § 231(a)(3).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, St. Onge faces up to five years' imprisonment, three years' supervised release, a $250,000 fine, restitution, and a $100 special assessment on each count of conviction.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The government agrees with the sentencing Guidelines calculation set out in the PSR, namely:

Count One: 18 U.S.C. § 231(a)(3)

|  |  |  |  |
|---|---|---|---|
| U.S.S.G. § 2A2.4 | Base Offense Level | | 10 |
| U.S.S.G. § 2A2.4(b)(1) | Physical Contact | | +3 |
| | | **Total** | **13** |

Count Two: 18 U.S.C. § 231(a)(3)

|  |  |  |  |
|---|---|---|---|
| U.S.S.G. § 2A2.4 | Base Offense Level | | 10 |
| U.S.S.G. § 2A2.4(b)(1) | Physical Contact | | +3 |
| | | **Total** | **13** |

|  |  |
|---|---|
| **Combined Offense Level** | **15** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | <u>-2</u> |
| **Total Adjusted Offense Level:** | **13** |

*See* PSR at ¶¶ 53-71.

Section 4C1.1 does not apply in this case (*see* PSR at ¶ 70), because of St. Onge's personal use of violence or credible threats of violence against people or property.[2]  In construing U.S.S.G. § 4C1.1(a)(3), Judge McFadden defined "violence" as "[t]he use of physical force," typically "accompanied by fury, vehemence, or outrage" and "unlawfully exercised with the intent to harm". He also defined it as "the "exertion of any physical force so as to injure or abuse." *United States v. Bauer,* No. 21-cr-386-2 (TNM), ECF No. 195 at 4-5; see also *United States v. Hernandez*, No. 21-cr-445 (CKK), ECF No. 65 at 5 (adopting Judge McFadden's definition of violence from Bauer).   Judge McFadden defined a "credible threat of force" as "a believable expression of an intention to use physical force to inflict harm." *United States v. Bauer*, No. 21-cr-386-2 (TNM), ECF No. 195 at 6.

> In evaluating whether credible threats of violence were posed by the defendant's offense conduct, to my mind, the context matters very critically. In other words, evaluating a defendant's offense conduct requires examination of all the factors of the offense including what the particular defendant being sentenced did; where he was; what he was seeing; what a person would reasonably understand was the volatility of the situation; the threat that whole situation would pose to others; the foreseeable harm of the situation; and the consequences of the specific defendant's individualized actions. So the fact that this defendant is not personally charged with assaulting or attacking officers is, therefore, not sufficient to make him eligible for the zero criminal history score offense-level reduction.

*United States v. Andrulonis*, No. 23-cr-085 (BAH), Sentc'g Hrg. Tr. at 11-12. St. Onge joined the violent mob in multiple collective pushes against outnumbered officers on the East Front

---

[2] The plea offer to St. Onge was made by the government before U.S.S.G. § 4C1.1 became effective. Therefore, the plea agreement did not include an explicit agreement as to the provision's inapplicability.

and in a confined space inside the Lower West Terrace tunnel. His comments on the West Plaza make his anger toward the police clear. His receipt and possession of a stolen police riot shield makes it clear he knew he was pushing and fighting against police in the tunnel. And the speaker he passed forward to be used as a weapon further conveys a threat to use violence against officers that day. All of this evidence shows that 4C1.1 is inapplicable in this case.

The U.S. Probation Office calculated the defendant's criminal history as category II, which is not disputed. PSR ¶ 86. Accordingly, based on St. Onge's total adjusted offense level, after acceptance of responsibility, of 13, his Guidelines imprisonment range is 15 to 21 months' imprisonment.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As detailed in Section II(B) of this memorandum, St. Onge's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. St. Onge actively and forcefully interfered with police officers on the East Front before walking all the way around the building to the West Plaza where he witnessed numerous acts of violence against the police but didn't turn around. Instead, he advanced to the tunnel, the scene of the worst fighting, where he joined at least two push efforts against the police line, aided other rioters, and passed up improvised weapons to rioters. The nature and

circumstances of St. Onge's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 21 months' imprisonment.

### B.  The History and Characteristics of the Defendant

St. Onge is a 6'4" 310-pound 36-year-old man with an inconsistent employment history and a lengthy history of arrests and convictions. According to the PSR, St. Onge has had numerous jobs over the past ten years, none lasting more than two years. PSR ¶¶ 138-49. He was separated from a number of these positions because of behavioral issues, including that he would "become enraged" while at work. *See generally* PSR ¶¶ 141, 142, 146. St. Onge also has 13 criminal convictions, including convictions for possession of cannabis, damage to property, disorderly conduct, battery, domestic battery, assault, and various traffic offenses. *See* PSR ¶¶ 72-84. He also has numerous arrests, including arrests for aggravated assault, simple assault, disorderly conduct, and domestic battery. PSR ¶¶ 72; 90-105. In fact, St. Onge was on probation for a 2019 assault conviction on January 6, 2021. PSR ¶ 84. And, while St. Onge was on pretrial release, he was arrested for allegedly throwing an ashtray at a woman and then punching her in the throat at a bar. PSR ¶ 105. When another bar patron intervened, St. Onge allegedly pushed him to the ground, kicked him, and stomped on his chest. *Id.* St. Onge then fled the scene in his car and was arrested for driving under the influence of alcohol. *Id.*

St. Onge's criminal and employment history thus reveal him to be a violent and angry person. His past is littered with episodes of violence indicating that his actions on January 6, 2021 were not isolated incidents. In fact, St. Onge's continued criminal conduct even while under the supervision of this Court indicates he is at a greater risk of recidivism and requires a sentence at

the high end of the Guidelines range to achieve specific deterrence from future criminal conduct.

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. St. Onge's criminal conduct on January 6 was the epitome of disrespect for the law.

**D.     The Need for the Sentence to Afford Adequate Deterrence**

***General Deterrence***

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

***Specific Deterrence***

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. As set out above, St. Onge's actions on January 6 were far from his first incidents of violence. St. Onge has a pattern of acting on his anger through violence. And his prior encounters with the judicial system have failed to curb his violent tendencies. St. Onge committed the January 6 offenses while on probation for a state assault conviction (PSR at ¶ 84), and he violated pretrial release conditions imposed by this Court (PSR at ¶ 104). St. Onge also continues to insist, even with his sentencing hearing looming, that he did

---

[3] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

not know there were police officers inside the Lower West Terrace tunnel, despite his clear observations of police at other locations around the Capitol, his personal handling of stolen police gear, his likely clear view of police in the tunnel given his height advantage over others in the tunnel (which would have allowed him to see officers over other rioters' heads), and his observations of rioters who were suffering the effects of OC spray. Given St. Onge's inability to comply with the law and lack of remorse, a term of incarceration at the top of the Guidelines range is required to achieve specific deterrence.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

F.      **Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision

leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[4]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[5] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

*United States v. Roger Baugh,* 22-CR-313 (JEB). Like St. Onge, Baugh observed violence by rioters toward the police before reaching the tunnel. After reaching the tunnel, Baugh engaged in several heave-ho pushes against the police, like St. Onge. However, unlike St. Onge, Baugh did not have any criminal history, much less 13 prior criminal convictions. Additionally, Baugh was only convicted of one violation of 18 U.S.C. § 231 and did not engage in additional assaultive or obstructive conduct against the police. Baugh had a lower Guidelines range than St. Onge, a range of 8 to 14 months. Judge Boasberg sentenced Baugh near the top of that range: to 12 months and 1 day's incarceration.

---

[4] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

*United States v. Nolan Cooke*, 22-CR-52 (RCL). Like St. Onge, Cooke pushed the police barricades marking the restricted perimeter on the East Front. After breaching the barricades on the East Front, Cooke confronted the officers at the Rotunda Doors for several minutes, like St. Onge repeatedly confronted the police inside the tunnel. Like St. Onge, Cooke did not make it inside the building. Unlike St. Onge, Cooke was forthcoming when interviewed by law enforcement about his actions and provided access to evidence in his possession. Also unlike St. Onge, Cooke did not have any criminal history and his offense level was 11 resulting in a Guidelines range of 8 to 14 months. Cooke pleaded guilty to a single count of civil disorder and Judge Lamberth sentenced him to 12 months and 1 days' incarceration, a sentence near the top of the Guidelines range.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[6] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction,

---

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that St. Onge must pay $2,000 in restitution, which reflects in part the role St. Onge played in the riot on January 6.[7] Plea Agreement at ¶ 13. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) St. Onge's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 189.

## VIII.   FINE

The defendant's convictions for violations of 18 U.S.C. § 231(a)(3) subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b).   The guidelines fine is $5,500 to $55,000. PSR at ¶ 187.   In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except

---

[7] Unlike under the Sentencing Guidelines for which the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. See *United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the PSR states that St. Onge has the ability to pay a fine in addition to restitution (PSR at ¶ 160). Thus, pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $5,500 to $55,000. U.S.S.G. § 5E1.2(c)(3).

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 21 months' incarceration, three years of supervised release, $2,000 in restitution, and a $200 special assessment.

                              Respectfully submitted,

                              MATTHEW M. GRAVES
                              UNITED STATES ATTORNEY

        BY:     */s/ Kaitlin Klamann*
                              KAITLIN KLAMANN
                              Assistant United States Attorney
                              Illinois Bar No. 6316768
                              601 D Street NW
                              Washington, D.C. 20530
                              Kaitlin.klamann@usdoj.gov

SEAN P. McCAULEY
Assistant United States Attorney
New York Bar No. 5600523
601 D Street NW
Washington, DC 20530
Sean.McCauley@usdoj.gov