**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Case No. 23-CR-237-2(CJN) |
| ) | |
| vs. ) | |
| ) | DEFENDANT'S SENTENCING |
| ALAN MICHAEL ST. ONGE, ) | MEMORANDUM |
| ) | |
| Defendant. ) | |

Prior to January 6, 2021, Alan St. Onge was a former philosophy major, a mental health professional, and a potential law school student. Now Alan is a convicted felon already subject to house arrest, and he appears before this Court for sentencing. He has made no excuses for his behavior on January 6, 2021, nor will he do so here. Instead, this sentencing memorandum will explore the history, characteristics, and experiences setting forth how Alan arrived at this moment.

Alan St. Onge, by and through his undersigned counsel, respectfully submits this Sentencing Memorandum to assist the Court in fashioning a reasonable sentence. The advisory guideline range suggested in the Presentence Investigation Report ("PSR") and advocated by the government is greater than necessary to accomplish the goals of sentencing in 18 U.S.C. § 3553(a), and it is inconsistent with United States v. Booker, 543 U.S. 220 (2005), United States v. Rita, 551 U.S. 338 (2007), and Gall v. United States, 552 U.S. 38 (2007). At sentencing slated for May 17, 2024, Alan will seek a downward variance from the advisory Guidelines range.

**I.      Background**

The events of January 6, 2021 did not happen in a vacuum, and neither did the circumstances that led Alan to the Capitol that day. As Alan tells it, he saw a flyer for the

'Stop the Steal' rally. He was keenly interested in politics and jurisprudence, and as he was contemplating entering law school, he wanted to hear former President Trump speak. He had been working as an Interventionist, a stressful position made more so by nationwide travel and a less than supportive management structure. He and a team of other behavioral and mental health professionals would be dispatched to transport persons in crisis to various treatment centers nationwide. Often, he would have little information from the company. He would be tasked with not only ensuring the safety of the team and patient, but he would do so while making travel arrangements and logistical considerations. He reports that he had not had any meaningful time off, much less an actual vacation, and he had never been to the District of Columbia. He had also never previously attended a rally or protest. Since he had already been traveling extensively for his employment, it seemed an ideal plan to Alan to secure an Airbnb, see the sights, attend the rally, and hear the former President speak.

It is important to note that Alan drove to the District of Columbia and attended the rally alone. While he made plans to meet with friends in Baltimore on the evening of January 6, he knew that he would be on his own for the rally. He arrived in DC on January 5, and he went straight to his lodgings. On the morning of January 6, he walked around the District, mostly following the crowds.

He was unsure of the location of the President's speech, and he ended up watching it on a screen outside a coffee shop. Following the speech, he followed the crowds to the Capitol where he saw large crowds of people gathering. He saw a man who was "bloody," and he recalls wondering what had happened.

Upon getting to the Capitol, Alan encountered the line of bike racks and police officers at the East front of the building. In the press of that crowd, Alan engaged in pushing against the people in front of him who were pushing against the barricade. At one point, he reached forward and grabbed the bike rack. These actions encompass the first count of the two (2) counts to which he plead guilty.[1] Immediately following this interaction, he left the Capitol's East front area. He made his way around the still-intact perimeter, and he stopped to engage other people in conversation regarding the events occurring.

At this point, it is helpful to have some perspective regarding Alan's background and mindset. Alan, with a degree in philosophy and a keen interest in politics and law, often engages people in Socratic questioning to gain information and to ascertain their motivations. While this habit has oftentimes served him well in the scope of his employment as a mental health professional, where he often deals with persons in the throes of mental health crises, it can be ill perceived in other settings.

This habit has formed a basis for some of the encounters detailed in the criminal history section of his PSR. It is also exacerbated by Alan's physical stature,[2] and his issues with alcohol in social settings. While his undersigned counsel abhors the government's tawdry assertions regarding his physical appearance, certain perceptions due to Alan's size are inevitable.

---

[1] It should be noted that by pleading guilty to two (2) separate counts, the only plea offer tendered by the government, they do not group under the United States Sentencing Guidelines, and they resulted in a two-level increase from 13 to 15. PSR ¶67.

[2] The government's frequent references to Alan's height and weight, as well as its blanket assertion that his conduct was somehow more harmful, dangerous, or egregious due to his physical stature, is distasteful and unfair.

Further, during the prior years, while traveling the country for his work, Alan was exposed to a steady stream of various protests throughout the country covered by national and local media. As someone who had never attended a rally or protest of any kind, Alan's only perceptions came because of media coverage. As such, he tended to believe that other protests frequently resulted in violence and that protesters were "permitted" to destroy property and disrupt roads, buildings, and cities.

Thus, Alan's initial exposure to violence and lawlessness was not shocking. What shocked him was that the police were not only acting against the crowd, but the police were actively trying to prevent further violence using standard crowd control measures.

During this time, Alan was near the West front of the Capitol, and he found himself amid other persons engaging in physical skirmishes with police officers as noted in the government's sentencing memorandum. In the screenshot exhibit, Alan is standing while skirmishes are going on all around him. This image was from an officer's body worn camera, and it is notable that Alan was not engaged in any of those skirmishes. It is also notable because his scarf is pulled around his lower face. Alan pulled his scarf down, because he had encountered his first instance of pepper spray used by the police against rioters. It is after walking away from these skirmishes that Alan is heard on a recording expressing profane disbelief that the officers had turned on the protestors.

Alan made his way with the crowd up to what is now known as the Lower West Terrace Tunnel. It is undisputed that he was near the mouth of the tunnel, engaged in at least two (2) separate pushing instances with surrounding people, and he appeared to leave the tunnel area and return several times. It is also undisputed that he passed a

speaker forward when it was passed to him, that he was passed a riot shield and instead of passing it forward, he set it against the wall, and he assisted others in cleaning their eyes and passing water bottles.

The disputes arise as to what these various actions mean and how much they should be attributed to incurring punishment. The government attributes nefarious and assaultive purposes to nearly all these events. According to the government, Alan passed the speaker forward as a weapon to be used against police, but the government fails to explain why he chose not to pass the riot shield forward and instead set it against the wall. One of the more obvious explanations would be that Alan did not believe they were pushing against police but rather stationary doors. During his voluntary debrief following his plea and prior to sentencing, Alan was asked if he knew that police were at the end of the tunnel, and he truthfully responded that he did not. It makes sense that a large speaker may be used against a door, but a riot shield would essentially be worthless for that purpose.

Regardless of what Alan thought in the crush of people in that tunnel for the minutes he was in that area, he acknowledged at his May 8, 2024 debrief interview that he *should have known*. Over three (3) years removed from the fateful day and with the benefit of nearly minute-by-minute video footage, Alan readily admits that he should have put the pieces together that the crowd he joined with in the tunnel were pushing against police. However, Alan he did not know and could not have known during the event, because he could not see the end of the tunnel.

Again, the government makes much of Alan's physical size and perceived strength, but the fact remains that Alan was one of a group of persons pushing in that

tunnel. Just as his participation as part of a group does not alleviate his responsibility for his actions, neither does his size somehow make him more culpable than the others in that tunnel.

Alan St. Onge left the Capitol area following his final exit from the tunnel. At this point, it is important for the Court to know what Alan did not do. He never entered the Capitol. He did not post anything on social media to glorify the violence or perpetuate the "Stop the Steal" lie. He had no social media presence, and neither before nor after January 6, 2021 did he participate in chat rooms or on-line discussions. He is not a member of any of the extremist groups that converged on the Capitol that day. Most importantly, he accepted responsibility for his actions on January 6, 2021 by pleading guilty and following through with a truthful debrief of his actions on that date. He also submitted to a voluntary review of his social media accounts and his cell phone. In fact, the government has retained possession of his cell phone since his arrest and has not consented to return it, despite his plea and debrief.[3]

## II.     Sentencing Guidelines

This Court does not require another recitation of *Booker*, the parsimony clause, or a dry recitation of the §3553(a) factors, This Court is well-versed in all. Rather, the undersigned counsel will set out why, as to Alan St. Onge, the sentencing guidelines are largely inapplicable and as reached, too high to be of use to this Court in fashioning the appropriate sentence.

---

[3] The undersigned counsel has requested the return of the phone several times throughout this case since Alan is still paying for the phone. The government persists in its refusal to return it.

The guidelines themselves and the government's steadfast reliance on the result is designed to accomplish their original goal, which is to provide a uniform framework to sentence all persons convicted of a federal crime. The guidelines were designed to make sentencing fairer for all defendants and to set uniform standards across the board. Defense attorneys often decry the "cookie-cutter" nature of the guidelines and stress that by reducing complex human actions to 43 offense levels and six (6) criminal history levels, their application has become so simplistic that it defeats the purpose. Proponents tout the breadth of actions considered by the sentencing guidelines and the uniformity they create while stressing that sentencing memorandums, such as this one, are enough to set forth the remaining factors this Court must consider before passing sentence on a defendant. Proponents point to the guidance the guidelines provide to the Court in fashioning sentences, while defense counsel note the constraints of available sentences. This battle goes on.

In this case, like many of the January 6, 2021 cases, the guidelines reveal glaring weaknesses. In September 2021, the United States Sentencing Commission unveiled the Judicial Sentencing Information (JSIN) platform. JSIN is an on-line tool designed specifically for judges to allow them access to nationwide USSC statistics for "quick and easy online access to sentencing data for similarly situated defendants." USSC Resource Guide. JSIN allows judges to plug in a defendant's primary guideline (here §2X5.1), the final offense level (13), and the criminal history category (II). Using those parameters, JSIN then provides the number of sentences imposed nationwide and the average and median sentences. Presumably, this information assists judges in assessing potential sentencing disparities between similarly situated individuals.

Unfortunately, JSIN is not helpful in this case. Plugging in the above parameters for Alan St. Onge returns the following result:

> **FEDERAL DEFENDANTS IN SELECTED CELL**
> During the last five fiscal years (FY2019-2023), there was an insufficient number of defendants (1) whose primary guideline was §2X5.1, with a Final Offense Level of 13 and a Criminal History Category of II, after excluding defendants who received a §5K1.1 substantial assistance departure; and (2) who received a sentence of imprisonment in whole or in part.

Stated plainly, there simply isn't enough data for JSIN to form a result, and the Court is without statistical guidance available in other cases. The lack of data also harkens back to the unique nature of prosecutions arising from the assault on the Capitol.

Again, this Court is aware of ongoing litigation regarding the statutes used by the government to prosecute J6 defendants. The Court is also subjected to a steady cry of government overreach, as well as allegations that the government is contorting federal statutes in attempts to enhance punishments. The undersigned counsel is not making those arguments, but she is simply noting that §18 U.S.C. 231 directs this Court to the guideline at §2X5.1.

USSG §2X5.1 is a "catch all" guideline. As the PSR in this case notes, it "provides that if the offense is a felony for which no guideline expressly has been promulgated, apply the most analogous offense guideline." PSR ¶59. Obviously, the "most analogous offense" is a subjective determination that will vary from case to case, effectively negating any statistical accuracy.

The analogous offense guideline here is Obstructing or Impeding Officers, which encompasses a large swath of conduct. None of the contemplated conduct specifically considers the historic and unprecedented nature of that fateful January 6, 2021.

All these realities combine to make the guidelines largely ineffectual for the designed purpose and decidedly unhelpful. The undersigned counsel would note that the government maintains an updated sentence database for J6 defendants. More importantly, co-defendant Stover's learned counsel devoted a significant amount of his client's sentencing memorandum to setting out the sentences of "similarly situated" J6 defendants, as well as significant statistics regarding the number of Capitol breach defendants that the government did not even seek a sentence of incarceration.

The government's two comparison cases noted in its sentencing memorandum, *Cooke* and *Baugh* both describe similar conduct to Alan in the tunnel. The government's noted distinctions are the two other defendant's lesser criminal history category[4] and most telling, the lack of a second count of conviction.  As previously noted, the government's insistence on a second count for Alan St. Onge directly correlates to the difference in offense levels, not due to any more egregious conduct, but merely by the constructs of  "grouped offenses" within the guidelines. The comparison cases cited in co-defendant cases, as well as the co-defendant's Stover and Kumer themselves, are much more accurate comparisons.

In closing, the undersigned counsel respectfully asserts that particularly in January 6, 2021 prosecutions, the guidelines and statistical comparative attempts by the government are haphazard and far removed from the purported uniformity of sentencing espoused by the government.

---

[4] The government's assertions inflated the nature and substance of Alan's criminal history as well putting forth the now rejected USSG enhancement for "being under a criminal justice sentence at the time of the offense" is off-putting and unnecessarily gilding the lily to argue for incarceration. The assertions that Alan was not forthcoming, did not show remorse and the numerous references to his physical stature as purported enhancing conditions are patently false and pejorative.

### III.  Proposed Sentence

Alan St. Onge plead guilty to two (2) felony counts and agrees that he should be punished for his actions on January 6, 2021. He is now a convicted felon who has lost important rights of citizenship, such as the right to own firearms and to vote. He is employed in a professional capacity in the North Carolina mental health provider system, and this conviction will follow him professionally for the rest of his life. Any remaining dreams of law school are now effectively quashed by his actions on that date. His personal liberty has been restricted, certainly since December 22, 2023 when he was placed on home detention because of his pending North Carolina state charges.[5]

A sentence of probation with a component of continued home detention would be the appropriate sentence in this matter. Alan can and will abide by the strictures of home detention and will continue to reside in the family home with his mother who has steadfastly agreed to report any violations to the Court. Such a sentence would satisfy the parsimony clause and serve as a deterrent for future criminal conduct from Alan, as well as a general deterrent to the public at large.

Despite the unhelpful nature of the guidelines in this case, the undersigned counsel respectfully asserts the following in support of the Court crafting a non-incarceration sentence: had the government not insisted on two (2) counts of conviction,[6] the guidelines would have been two-levels lower resulting in a proposed

---

[5] Counsel notes that all charges from November 23, 2023 remain pending at the time of Alan's sentencing. He is presumed innocent, and the merit of those charges will be assessed in a court of law in Buncombe and Transylvania Counties, North Carolina in the coming months.

[6] The undersigned counsel offers this analysis as the basis for a potential variance to be considered in conjunction with the §3553(a) factors set forth in this memorandum.

sentencing guideline range of 10 to 16 months, in Zone C, which effectively allows for a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention so long as half the minimum term is satisfied by imprisonment. USSG §5C1.1(d)(2). Such a change would have also allowed for a one-level variance to place Alan St. Onge firmly in Zone B of the sentencing table, thus specifically allowing for a probation sentence.

Per the current guidelines, a three-level variance would result in Level 10, Criminal History Category II, for a sentencing range of eight (8) to 14 months in Zone B of the table expressly permitting a probationary sentence. Such a sentence with a component of home detention would allow Alan to continue to work thus enabling him to pay the restitution in this matter as well as supervision fees and still provide the oversight and possibility of incarceration for any violation.

Respectfully Submitted,

/s/Renae Alt-Summers
Renae Alt-Summers
DC Bar ID #: SC0011
3608-C Landmark Drive
Columbia, SC 29204
(828) 243-5253
raltsummers@gmail.com

Columbia, South Carolina
May 14, 2024